**In re Rusty/Christina PIER, Debtors.**

**No. 03–34568.**

United States Bankruptcy Court, N.D. Ohio.

Feb. 20, 2004.

David A. Hyman, Paulding, OH, for Debtors.

Bruce C. French, Lima, OH, trustee.

Andrew R. Vara, Cleveland, OH, for U.S. Trustee.

### DECISION AND ORDER

RICHARD L. SPEER, Bankruptcy Judge.

The instant cause is before the Court upon the Motion of the United States Trustee to Dismiss and the Debtors' Response thereto. The Trustee's Motion is brought pursuant to 11 U.S.C. § 707(b) which generally provides that, when an individual holds primarily consumer debt, a court may dismiss the case if it finds that its continuation would result in a "substantial abuse" of the bankruptcy process. The overall factual basis for the Trustee's Motion is that Debtors have the means by which to repay all of their unsecured obligations.

In making its assertion, the Trustee relied upon the information as set forth by the Debtors in their petition. This information showed that the Debtors had allocated $900.00 dollars per month for the repayment of their unsecured debts, the amount of which, the Trustee noted, could "repay all unsecured creditors in roughly eighteen months." (Doc. No. 5, at pg. 4). On December 16, 2003, the Court, in accordance with the procedural requirements of § 707(b), held a hearing on this matter. At this Hearing, the Debtors, in arguing for the continuation of their case, brought to the Court's attention a couple of additional matters.

First, it was pointed out that contrary to the assertion made by the Trustee in its Motion to Dismiss, the Debtors were not reaffirming on their residence. On this same subject, it was also brought to the Court's attention that the Debtors' had surrendered their residence, and that based upon a negative equity balance in the property, they would be incurring an additional $31,000.00 in unsecured debt. The Debtors also made it known that their financial circumstances had changed since the time they filed for bankruptcy. Of particular importance, the Debtor, Christina, was no longer employed; this lack of employment was ascribed to the loss of their residence which they contend had forced them to relocate some distance away, thus making it impracticable for Christina to keep her present employment.

Based upon the above points, the Court, at the conclusion of the hearing held on this matter, ordered the Debtors to amend their bankruptcy petition. Thereafter, the Debtors filed with the Court an updated copy of their bankruptcy schedules I & J. Overall, the figures, as set forth in these revised schedules, revealed a monthly disposable income of just $67.04. In response to the submission of these revised figures, the Trustee filed a supplemental memorandum renewing their Motion to Dismiss based largely upon its perception that the Debtors' itemized monthly expense figures were not entirely credible.

### DISCUSSION

The United States Trustee's Motion to Dismiss is brought pursuant to § 707(b) of the Bankruptcy Code which provides, in relevant part:

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an

individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter.

As a determination of dismissal under this section directly involves the ability of a debtor to receive a discharge and directly affects the creditor-debtor relationship, this matter is a core proceeding over which this Court has the jurisdictional authority to enter final orders. 28 U.S.C. §§ 157(b)(2)(J)/(O); 1334.

■ Section 707(b) was added by the Congress of the United States in 1984 "in response to concerns that some debtors who could easily pay their creditors might resort to chapter 7 to avoid paying their obligations." *In re Shepherd,* 147 B.R. 422, 424 (Bankr.N.D.Ohio 1992). Section 707(b), thus, furthers the bankruptcy policy of limiting its use to only those debtors truly in need of relief, thereby helping to preserve the integrity of the bankruptcy process. In an effort, however, to balance the concern that § 707(b) would be used in a manner exceeding its purpose, Congress limited its breadth in two important ways: (1) only the court or the United States Trustee, and not an individual creditor, could bring an action to dismiss under the section; and (2) the statute provides that "[t]here shall be a presumption in favor of granting the relief requested by the debtor."

■ Broken down, § 707(b) contains three overall elements: (1) the debtor must be an individual; (2) the debts must be primarily consumer debts; and (3) granting relief to the debtor under Chapter 7 would be a "substantial abuse." *In re Wisher,* 222 B.R. 634 (Bankr.D.Colo. 1998). With respect to the applicability of these requirements to the instant case, the first is evident, and the Debtors have agreed, at least tacitly, that the majority of their debts are "consumer debts." The sole matter thus before the Court is whether allowing the Debtors' case to continue would constitute a "substantial abuse" of the bankruptcy process within the meaning of § 707(b).

■ In *In re Krohn,* the Sixth Circuit Court of Appeals held that, for purposes of § 707(b), "[s]ubstantial abuse can be predicated upon either a lack of honesty or want of need." 886 F.2d 123, 126 (6th Cir.1989). For this purpose, the principal issue with respect to "honesty" is whether the debtor is "merely seeking an advantage over his creditors . . . ." A determination of "need," on the other hand, is made by looking to whether truly the debtor's "financial predicament warrants the discharge of his debts in exchange for liquidation of his asserts." *Id.* To answer these questions, the Court in *In re Krohn,* held that a court should consider the "totality of the circumstances." *Id.*

■ In looking to the "totality of the circumstances," the Court in *In re Krohn* also gave some factors which a court should consider. As it concerns a debtor's "need" for bankruptcy relief, these factors may include, but are not limited to, (1) the extent to which a debtor has the ability to repay his debts out of future earnings, (2) whether the debtor enjoys a stable source of future income, (3) the debtor's eligibility for debt relief under a Chapter 13 plan of reorganization, (4) the existence of any state remedies which would ease the debtor's financial predicament, (5) the degree of relief obtainable through private negotiations, and (6) the extent to which a debtor's expenses can be significantly reduced without depriving the debtor of adequate food, clothing shelter and other basic necessities. *Id.* at 126–27.

■ In applying these considerations to the information as presented in this case,

the Court is persuaded by the arguments of the United States Trustee that the Debtors do not have the requisite "need" to be entitled to the relief afforded by Chapter 7 of the Bankruptcy Code. As such, the United States Trustee's Motion to Dismiss under § 707(b) will be Granted. The basis for this conclusion is explained in detail below.

■■■■ Of the considerations set forth in *In re Krohn* that are relevant to a debtor's "need," the first one is of primary importance: whether the debtor has the ability to "repay his debts out of future earnings." The extent of this importance was bluntly put by the Sixth Circuit when in *In re Krohn* it stated, "[t]hat factor alone may be sufficient to warrant dismissal." *Id.* In assessing a debtor's ability to repay his debts, a court's task is to hypothesize whether the debtor, if he or she had filed for relief under Chapter 13 of the Bankruptcy Code, as opposed to Chapter 7, would be able to repay their debts with relative ease. *In re Stallman*, 198 B.R. 491, 495 (Bankr.W.D.Mich.1996). Like in a Chapter 13 case, such a determination is made by looking to the amount of "disposable income" available to repay the debts. Section 1325(b)(2), whose definition is utilized in determining "need" under § 707(b),[1] defines "disposable income" as that "income which is received by the debtor and which is not reasonably necessary to be expended for the maintenance or

support of the debtor or a dependent of the debtor . . . [.]"

In their original bankruptcy petition, the Debtors acknowledged, in their schedule of current expenditures, that they were devoting $900.00 per month to repay their unsecured debt obligations. Within the meaning of § 1325(b)(2) this constitutes "disposable income." On the other side of the equation, the Debtors' unsecured debts, even after taking into account the full extent of any possible deficiency which may arise from the sale of their former residence, total no more than $47,000.00. Based upon these figures, simple math then shows that the Debtors could easily satisfy all of their unsecured obligations in approximately 52 months, well under the 60–month duration allowed for in a Chapter 13 plan. 11 U.S.C. § 1322(c). Under such circumstances, the Debtors clearly have the ability to repay their unsecured debts with relative ease, and thus lack any true "need" to maintain their bankruptcy case for purposes of determining the existence of "substantial abuse" within the meaning of § 707(b).[2]

The Debtors, however, want this Court to utilize those revised income and expense figures submitted to the Court which show an almost complete lack of "disposable income." In specific numbers, these figures are as follows:

(1) Income (net)—$3,305.41[3], revised from $3,486.90 (inclusive of the $900.00

---

1. *See, e.g., In re Austin*, 299 B.R. 482, 486–87 (Bankr.E.D.Tenn.2003).

2. Grounds for dismissal found based on the following percentages: 89% over three years and 100% in five years, *Fonder v. United States*, 974 F.2d 996, 1000 (8th Cir.1992); repayment of two-thirds of debt over three years and 100% over five years, *In re Walton*, 866 F.2d 981, 985 (8th Cir.1989); ability to pay 30–80% of debt over three years grounds for dismissal, *In re Beckel*, 268 B.R. 179, 185 (Bankr.N.D.Iowa 2001); case dismissed under § 707(b) where 37.2% could be paid in

three years and 62% could be paid in five years, *In re Woodward*, 265 B.R. 179, 195 (Bankr.S.D.Iowa 2001); abuse found where debtor could repay 20% of debt over three years, *In re Praleikas*, 248 B.R. 140, 145 (Bankr.W.D.Mo.2000); 25–35% unsecured debt repayment over three years and 42–58% over 5 years was grounds for dismissal, *In re Coleman*, 231 B.R. 760, 763 (Bankr.D.Neb. 1999).

3. Deducted from net income here is a previously unlisted 401(k) contribution of $204.36.

expense listed by Debtors to service their unsecured debts) as set forth in their original petition; and

(2) Expenses—$3,238.37, revised from $3,486.90 as set forth in their original petition.

Based upon these revised figures, the amount of monthly "disposable income" ostensibly available to the Debtors declined from $900.00 to just $67.00. From this near lack of "disposable income," the Debtors contend that they simply have no realistic possibility of repaying their unsecured debts, thus, making dismissal for "substantial abuse" under § 707(b) improper.

■ To the extent that the Debtors' revised income and expense figures may be utilized, the Court agrees that they lack any real ability to repay their unsecured debts. Still, this Court is not required to accept at face value a debtor's enumerated income and expense figures. *Mitcham v. U.S. Dep't of Ed. (In re Mitcham)*, 293 B.R. 138, 144 (Bankr.N.D.Ohio 2003). Rather, like any other evidence, the weight which can be afforded to such figures hinges on the credibility which can be afforded to the revisions. This inquiry as to credibility naturally begins by looking to the reason(s) for the changes.

■ Logically speaking, there exist only two possible explanations for the revisions in the Debtors' monthly budget: (1) either the original figures were not correct; or (2) the revised figures represent postpetition changes that occurred in the Debtors' financial condition. Although not specified, the facts presented in this case would tend to suggest that the latter explanation was the cause for the revisions contained in the Debtors' revised monthly budget. Specifically telling in this respect is that the Debtors' revised monthly financial figures reflect a loss of employment income from the Debtor, Christina, a state of affairs which, as the Court understands it, occurred postpetition. Nevertheless, debtors, in matters affecting their discharge, are to be given all benefits of the doubt. *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443, 1452 (6th Cir.1994). As result, both possible explanations, beginning with the latter, will be examined.

■ Under bankruptcy law, substantive interests and rights are generally fixed upon the filing of the bankruptcy petition. *See, generally, Leppaluoto v. Combs (In re Combs)*, 101 B.R. 609, 614–15 (9th Cir. BAP 1989) (there is a general bankruptcy policy of using the filing date as a guidepost in establishing a party's rights in bankruptcy). Important examples include, but are not limited to the following areas: § 362(a), time of filing of bankruptcy petition determines when the automatic stay goes into effect; under § 506, the petition date establishes the date at which time secured claims are evaluated; the terms of § 522 provide that the petition date establishes whether a debtor is entitled to an exemption; § 541(a) provides that the time of filing determines what constitutes property of the debtor's bankruptcy estate. Also, the time of filing generally sets the point from which a trustee's avoiding powers are measured. § 544, § 547, § 548. From both a policy and a statutory interpretation standpoint, this same result is compelled when making a determination of "substantial abuse" under § 707(b).[4]

---

4. Other than the repayment of the filing fee, this rule does not prejudice the debtor because if their postpetition financial condition did actually deteriorate, but their case in nevertheless dismissed, there exist no prohibition against the debtor refiling. Moreover, this could actually be advantageous as any additional debt incurred up until the refiling would be subject to discharge under § 727.

■ First, from a policy standpoint, a bankruptcy, as a court of equity, should not permit a debtor to rely on the argument of "no harm, no foul." However, this is exactly what would occur if an unforeseen, postpetition deterioration in a debtor's financial affairs could be used retroactively to justify a bankruptcy which, at the time it was filed, would have otherwise constituted a "substantial abuse" within the meaning of § 707(b).

■ From a statutory interpretation standpoint, § 301 of the Bankruptcy Code sets forth that, "[t]he commencement of a voluntary case ... constitutes an *order for relief* under such chapter." (emphasis added). Referring then to the order for relief, § 707(b) provides that a dismissal is proper if the court "finds that the *granting of relief* would be a substantial abuse ..." (emphasis added). Thus, read together, § 707(b) is simply a mechanism by which, if its conditions are met, a court can undo its original order for relief. By extension then, by referring to the order for relief, which under § 301 is automatically entered at the time a petition is filed, § 707(b)'s concern must be focused on the circumstances as they existed at the time a debtor's case is commenced.

■ Nevertheless, the focus of § 707(b) on the petition date does not mean that postpetition revisions to a debtor's income and expenses are automatically irrelevant. When a debtor files a bankruptcy petition, they are required to disclose their *current* income and expenses, in essence, providing a snapshot of their financial affairs as of the date of the petition. *U.S. Trustee v. Harris*, 960 F.2d 74, 77 (8th Cir.1992). Under certain circumstances, however, this may mean that prepetition considerations relevant to a debtor's "ability to pay" his or her debts for purposes of § 707(b) would not be readily discernable from the schedules. To illus-

trate, a debtor who files bankruptcy in anticipation of a job loss would still, at the time of the petition, show employment income. Yet the anticipation of the job loss would likely have a direct correlation with the underlying bankruptcy, and thus possibly mitigate against an action brought to dismiss based upon "substantial abuse" under § 707(b). Having the exact opposite effect, soon to be received payments from a deferred annuity, although again relevant to a determination of a debtor's "ability to pay," would not yet be listed as income in the debtor's schedules.

■ Fairness thus dictates (for both creditors and the debtor) that postpetition revisions in a debtor's income and expenses be considered to the extent that they aid in providing an accurate picture of the debtor's financial status at the time of filing. Given, however, that § 707(b) is still only concerned with a debtor's prepetition financial condition, such revisions are only relevant in a § 707(b) analysis if there exists a strong nexus with the circumstances giving rise to the bankruptcy. *First USA v. Lamanna (In re Lamanna)*, 153 F.3d 1, 5 (1st Cir.1998). *See also In re Woodman*, 287 B.R. 589, 597 fn. 12 (Bankr. D.Maine 2003) (under § 707(b) a court must take debtors as it finds them, applying then the appropriate test based on existing and foreseeable facts, rather than on a hypothetical or objective model). In this case, based upon the cumulative effect of the Debtors' prepetition and postpetition financial circumstances, no such nexus exists, with just the opposite being true: the Debtors' bankruptcy simply enabled them to increase their discretionary spending to the detriment of their unsecured creditors.

To begin with, no dispute exists that, on a prepetition basis, the Debtors were devoting $900.00 to service their unsecured debt obligations, leaving them, to the ex-

act penny, with no additional income. However, after ostensibly eliminating this expense through the filing of their bankruptcy petition, the Debtors, in very short order, increased their other monthly expenditures by approximately One Thousand dollars; all this, despite the Debtor, Christina, no longer being employed. Hence, the sine quo non for the Debtors being able to increase their monthly expenditures, which are itemized immediately below, was their bankruptcy filing which permitted them to forego the burden of paying their previously incurred, unsecured debt obligations:

(1) The Debtor, Rusty, now devotes $204.36 toward a 401(k) plan.

(2) The Debtors incurred new monthly expenses of $152.00 for their child's tuition, laundry and dry-cleaning expenses of $35.00, $100.00 for their son's lawyer fees, and an expense of $80.00 for charitable contributions,

(3) Medical Expenses increased for the Debtors by $215.00 per month, mainly on account of medication needed for their son's asthma. A new expense of $116.30 for a student-loan obligation was also added.

(4) The Debtors increased their monthly entertainment expenses by $30.00, their monthly telephone expenses by $25.00, their monthly auto insurance payments by $30.00, and their monthly clothing expenses by $10.00.

The real heart of the problem here, from the perspective of § 707(b), is that prior to bankruptcy most of these expenses were either (1) not needed at all, or (2) not needed at the level the Debtors now de-

sire. Consequently, as the Debtors, on a prepetition basis, were presumably meeting their basic needs, it must also be assumed that most of these revised figures are simply discretionary spending. And, as discretionary expenses, they have no nexus to their bankruptcy.

Arguably, the student-loan obligation and the additional expense incurred by the Debtors for their son's asthma medication are not discretionary. All the same, any nexus between these expenses and the Debtors' bankruptcy is still lacking. First, in their petition the Debtors did not list any student-loan debt; thus, the doctrine of judicial estoppel[5] prohibits this Court from even considering this expense. As it concerns their son's asthma medication, it is simply incomprehensible that an expense of such significance and importance could have been in existence prepetition but somehow not set forth in their petition. By definition then, it must be assumed that this expense stems entirely from postpetition circumstances.

Setting, however, their expenses aside, the Debtors have intimated that there exists a direct correlation between their decline in household income and the events leading up to their bankruptcy. In factual terms, the Debtors put forth this progression of events: (1) the loss of their home as the result of their financial difficulties; (2) thereafter being forced to move some distance away to find affordable housing; and finally (3) after moving some distance away, it no longer being feasible for the Debtor, Christina, to keep her job. Logically speaking, the loss of the Debtors' home has a clear nexus with their bank-

---

**5.** Judicial estoppel may be defined as a bar against the alteration of a factual assertion that is inconsistent with a position sworn to and benefitted from in an earlier proceeding. *Texaco Inc. v. Duhe,* 274 F.3d 911, 920, 923 (5th Cir.2001). *See also Hamilton v. State*

*Farm Fire & Cas. Co.,* 270 F.3d 778, 785 (9th Cir.2001) ("[t]he courts will not permit a debtor to obtain relief from the bankruptcy court by representing that no claims exist and then subsequently to assert those claims for his own benefit in a separate proceeding.")

ruptcy; the same, however, cannot be said for events two and three.

As for event two, the Debtors' position concerning a lack of affordable housing near their former residence simply cannot be harmonized with the Debtors currently allocating almost $900.00 per month for their present housing. More to the point, the Court does not believe, as their argument requires, that in the general vicinity of their former marital residence, absolutely no suitable housing was available to the Debtors for less than $900.00 per month. As such, there is no reason, at least from a § 707(b) standpoint, that the Debtor, Christina, could not have kept her job.

However, even if for argumentative sake, the Debtors' position concerning a lack of affordable housing were correct, the Debtors' related position regarding her lack of employment still has a fatal weakness. At her previous job, Christina grossed just $708.00 per month—an amount, which based on a 40–hour week, is not above the minimum wage. Based upon her rather modest monthly income, it follows that comparably paid employment could again be easily obtained, thereby enabling the Debtors to enjoy an income level equal to or exceeding their prepetition income level. As an aside, it is also noted that a desire to stay at home with one's children (and the Debtors' have three), while certainly a worthy undertaking, cannot be presupposed to have any direct correlation with an underlying bankruptcy.

In sum, the Court cannot discern any appreciable nexus between the Debtors' revised income and expense figures when set against those circumstances giving rise to the Debtors' bankruptcy. Consequently, since "substantial abuse" under § 707(b) is gauged from the circumstances as they exist at the time of filing, the Debtors' revised figures, to the extent that

they reflect a postpetition change in financial circumstances, are not relevant in defending against the United States Trustee's Motion to Dismiss. Still, as set forth in the beginning, there does exist another possible explanation for the discrepancies as contained between those income and expense figures set forth in the Debtors' original petition and the later revisions submitted to the Court: an honest mistake.

■■■■ Bankruptcy Rule 1009(a) provides that a debtor may amend their bankruptcy petition "as a matter of course at any time before the case is closed." The existence of this Rule recognizes the reality that, when a petition is filed, mistakes and/or omissions may occur. On the other hand, bankruptcy law imposes a duty upon the debtor—which commences at the moment a case is filed—to make a full, complete, and honest disclosure of all the information which is required to be disclosed by law. *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1286 (11th Cir.2002). Thus, inherent in the nature of Rule 1009(a) is that a debtor's ability to amend a petition, for the purpose of correcting prior mistakes and/or omissions, is limited to situations involving inadvertence, and hence does not extend to undoing prior transgressions such as the concealment of known information. *In re Mueller*, 256 B.R. 445, 451 (Bankr.D.Md.2000) (in the absence of fraud or bad faith, a debtor is entitled to amend their schedules). As was previously stated by this Court: "while it certainly encourages debtors to be forthwith in disclosing the information they are required by law to disclose, [it] does not believe that a debtor can purge themselves of prior misconduct by simply amending their bankruptcy petition." *Crawford v. Monfort, (In re Monfort)*, 276 B.R. 793, 796 (Bankr.N.D.Ohio 2001). *See also, Nof v. Gannon (In re Gannon)*, 173

B.R. 313, 321 (Bankr.S.D.N.Y.1994) (an amendment to the bankruptcy petition does not thereby expunge the falsity of the petition); *Golden Star Tire, Inc. v. Smith (In re Smith)*, 161 B.R. 989, 992–93 (Bankr.E.D.Ark.1993) (the filing of corrected bankruptcy schedules does not necessarily cure the initial falsity of the schedules); *Bank of India v. Sapru (In re Sapru)*, 127 B.R. 306, 317 (Bankr.E.D.N.Y. 1991) (subsequent disclosure by the debtor is not sufficient to overcome the allegations of false oath or account). Whether a mistake was inadvertent, as with other matters in bankruptcy, must be made with the starting presumption that a debtor is honest. *Francis v. Riso (In re Riso)*, 74 B.R. 750, 757 (Bankr.D.N.H.1987) (a debtor is entitled to a starting presumption of honesty).[6]

■■■ A mistake or omission contained in a bankruptcy schedule will be found to be inadvertent, and thus properly subject to amendment, when a debtor lacks knowledge as to the misinformation. *In re Grogan*, 300 B.R. 804, 809 (Bankr. D.Utah 2003). Whether a debtor truly lacks knowledge as to the misinformation contained in a petition is decided primarily on the basis of two considerations: (1) the extent and degree of the misinformation; and (2) whether there existed a motive to provide the misinformation. *In re Grogan*, 300 B.R. at 809 (looking to motive); *In re Hudson*, 64 B.R. 73, 74 (Bankr. N.D.Ohio 1986) (continuing discrepancies in a debtor's schedules will place into question a debtor's honesty and credibility); *In re Peluso*, 72 B.R. 732, 738 (Bankr. N.D.N.Y.1987) (substantial abuse found where debtor increased his expenses on

three separate occasions). Both these considerations bear negatively for the Debtors.

To begin with, when considering their overall financial condition, the Debtors' revised monthly figures, for both existing and new expenses, increased by approximately One Thousand dollars when including Rusty's 401(k) contribution. While realizing that month-to-month variations in income and expenses are inevitable, it stretches the imagination that, if owed and in existence prepetition, the Debtors would innocently forget to set forth such a significant amount in prepetition expenses—several hundred dollars, possibly; a thousand dollars, no. Also, from a prepetition viewpoint, the honest nature of the Debtors' revisions is stretched even further when one adds motive into the equation.

As previously pointed out, of primary importance in a "substantial abuse" analysis under § 707(b) is the amount of "disposable income" a debtor potentially has available to fund a Chapter 13 plan of reorganization. Thus, to withstand a § 707(b) motion a debtor has a substantial incentive to show his or her disposable income as low as possible. In line therewith, the Debtors' revised monthly expenses were conveniently able to eliminate almost all their "disposable income"— thereby making the funding of a plan of reorganization facially impossible. Moreover, this was accomplished despite major changes, both up and down, in each of the Debtors' income.

Also of significance in the regard, (and potentially showing a course of misconduct), is the Debtors' original bankruptcy

---

6. Although afforded a presumption of honesty, a debtor who knowingly makes false representations on their bankruptcy petition (or other papers filed with the court) is subject to both civil and criminal penalties. 11 U.S.C. § 727 (denial/revocation of discharge); 18 U.S.C. § 152 (five years in prison). Also, as it relates to possible criminal matters, a bankruptcy court, when it reasonably believes that criminal activity has taken place, is to report its suspicions to the United States Attorney's Office. 18 U.S.C. § 3057(a).

petition which, down to the exact penny, also set forth a lack of "disposable income." Although in some limited circumstances there could exist a viable explanation for this outcome, the very nature of such a result is highly coincidental, and thus further indicative of expenses which have been padded and/or income which has been understated.

Therefore, for these reasons, to analyze this case from the perspective that the Debtors were, through their amended schedules, merely making changes to what were otherwise inadvertent prepetition omissions, raises an acute credibility problem as to the honest nature of the figures. Given this credibility problem, the burden clearly shifts to the Debtors to put forth a viable and strong explanation for the mistakes and omissions. No such explanation, however, has been offered.

█ Accordingly, given that those revised income and expense figures submitted by the Debtors, if in existence prepetition, do not carry with them the requisite degree of honesty, their use in the "substantial abuse" equation of § 707(b) must be completely discounted. Also, as explained by the Sixth Circuit in *In re Krohn,* a debtor's lack of "good faith and candor in filing schedules and other documents" may be indicative of a lack of honesty, with a lack of honesty, in and of itself, providing a separate and independent ground upon which to place a finding of "substantial abuse." 886 F.2d at 126.

In conclusion, those revised income and expense figures submitted to the Court, whether they are based upon prepetition errors and omissions, or postpetition changes in financial circumstances, cannot be included in this Court's analysis of "substantial abuse" under § 707(b). Relying then on those original income and expense figures submitted to the Court, the Debtors have shown that they have the

means by which to fully pay, with relative ease, all of their unsecured debts. Based thereon, to allow this case to continue would constitute, as the term is used in § 707(b), a "substantial abuse" of the bankruptcy process.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Accordingly, it is

**ORDERED** that this case, be, and is hereby, DISMISSED.

It is **FURTHER ORDERED** that, as is required under Bankruptcy Rule 2002(f)(2), the Clerk, United States Bankruptcy Court, is hereby directed to provide notice of this Order to the Debtors, attorney for the Debtors and all Creditors.