**In re James/Lena OOT Debtor(s).**

**No. 06–31622.**

United States Bankruptcy Court,
N.D. Ohio.

March 19, 2007.

Gordon R. Barry, Toledo, OH, for Debtors.

## DECISION AND ORDER

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after a hearing on the Motion of the United States Trustee to Dismiss Case pursuant to 11 U.S.C. § 707(b)(2) and (b)(3). At the Hearing, the United States Trustee, based upon subsequent information provided by the Debtors, limited the scope of its Motion to Dismiss to those grounds provided in § 707(b)(3). Upon the conclusion of the Hearing, the Court ordered the Debtors to submit updated information concerning their financial situation. (Doc. No. 56). The Debtors have since submitted this information, and after reviewing it, as well as all of the relevant evidence in this matter, the Court finds that this case should be Dismissed.

### FACTS

On June 30, 2006, the Debtors, James and Lena Oot, filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. In their petition, the Debtors disclosed secured claims totaling $516,734.00, and unsecured claims, all nonpriority, totaling $103,036.93. The Debtors' unsecured claims consisted of approximately $47,000.00 in educational debt, with the remaining unsecured debt being consumer debt, of which at least $40,000.00 represented purely credit-card debt. (Doc. No. 1).

The Debtors' secured claims consisted of the following obligations:

A $430,000.00 mortgage against their residence, with this same figure utilized by the Debtors when assigning a value to the property.

A $34,169.00 lien encumbering a 2005 Volvo valued at $29,000.00.

A $7,747.00 lien against a mobile home valued at $7,700.00.

A lien of $17,018.00 encumbering a 2002 Ford Windstar valued at $5,500.00.

A $27,047.00 lien encumbering a 2004 Mercedes Benz valued at $21,000.00.

Finally, a lien of $753.00 against a "Pop–Up Camper" valued at $1,500.00.

In their statement of intention, the Debtors indicated that they intended to reaffirm on each of these secured claims. Besides the above property, the only other property listed by the Debtors of any appreciable value were two 401(k) plans, with a combined value of $3,300.00, together with household furnishing worth $2,500.00.

In their bankruptcy petition, the Debtors listed three dependents: two sons, ages 19 and 7; and one daughter, age 15. It was also disclosed in their petition that the occupation of the Debtor, James Oot, was in "Finance," and that the Debtor, Lena Oot, was employed as an "Executive Assistant." In these occupations, the Debtors disclosed a combined gross monthly salary of approximately $11,500.00. No other source of income was listed by the Debtors in their petition, although it was later revealed that together the Debtors received some rental income from the lease of their mobile home.

After accounting for payroll deductions, including dual 401(k) contributions totaling $645.86, the Debtors claimed a combined monthly net income of $7,792.10. The Debtors then subtracted from this a total of $10,349.77 in monthly expenditures, thus leaving, according to the Debtors' figures, their household budget in the negative by $2,557.67 each month. Included in the Debtors' list of "current expenditures" were these items:

| | |
|---|---|
| $3,329.35 | Home mortgage payment, inclusive of taxes and insurance |
| $ 725.00 | Electricity and heating fuel |
| $ 200.00 | Home maintenance |
| $1,200.00 | Food |
| $ 308.00 | Auto Insurance |
| $ 420.00 | Transportation Expenses |
| $1,560.00 | Auto Payments |
| $ 150.00 | Auto Maintenance |
| $ 100.00 | Telephone |
| $ 175.00 | Cell Phones |
| $ 531.42 | Day Care |
| $ 150.00 | Pop–Up Camper |
| $ 326.00 | Mobile Home |

Not long after filing for bankruptcy relief, Mr. Oot lost his job. (Doc. No. 57, Ex. No. 1). Presently, Mr. Oot is employed as a substitute school teacher, netting $1,100.00 per month. During this postpetition period, Mrs. Oot was also informed that her position as an executive assistant could be placed in jeopardy, but has since represented to the Court that she is "confident that [her employer] will find another position to offer her at the same pay rate." (Doc. No. 60).

Based upon the postpetition change in their financial circumstances, the Debtors represented to the Court that they have drastically cut their current monthly expenditures so as to come almost exactly in line with their combined net monthly income which now stands at $3,616.42. The facts in this case also show that the Debtors, contrary to their original intent, have or will soon surrender all of their secured property. (Doc Nos. 26, 28, 29, 30, 51, 60).

## LAW AND LEGAL BACKGROUND

Before this Court is the Motion of the UST to Dismiss pursuant to 11 U.S.C. § 707(b)(3). As a determination of dismissal under this section directly involves the ability of a debtor to receive a discharge and directly affects the creditor-debtor relationship, this matter is a core proceeding over which this Court has been conferred with the jurisdictional authority to enter final orders. 28 U.S.C. §§ 157(b)(2)(J)/(O); 1334.

Section 707(b)(3) was enacted as a part of the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act, otherwise known as BAPCPA, which became effective on October 17, 2005. This section sets forth:

In considering under paragraph (1) whether the granting of relief would be

an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider—

(A) whether the debtor filed the petition in bad faith; or

(B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

This provision is but one of two subordinate paragraphs which a court is to utilize when determining whether a debtor's case should be dismissed for abuse under § 707(b)(1).[1] The other, contained in § 707(b)(2), is known as the "means test" and creates a presumption of abuse if, under its formulaic approach, a debtor is determined to have the ability to repay his or her creditors.

Like § 707(b)(3), paragraph (b)(1) of § 707 was significantly affected by the passage of BAPCPA. For purposes of this discussion, two modifications are of significance. First, prior to the enactment of BAPCPA, a case could only be dismissed under § 707(b) if the court found that the "granting of relief would be a *substantial abuse* of the provisions of this chapter." (emphasis added). However through BAPCPA, Congress adopted a lower standard by dropping the adjective "substantial" in § 707(b). 11 U.S.C. § 707(b)(1). Secondly, Congress also eliminated in BAPCPA what had otherwise been a safeguard for the debtor: under the former § 707(b), there existed a presumption in favor of allowing the debtor's case to proceed.

### DISCUSSION

■■■ When determining whether, under paragraph (b)(1), a case should be dismissed for abuse, § 707(b)(3) provides that a court is to consider, (1) whether the debtor filed the petition in bad faith, or (2) whether the totality of circumstances demonstrate abuse. These two grounds for dismissal are read in the disjunctive; thus a finding by the court that either of these grounds exists will warrant dismissing a debtor's bankruptcy case. 11 U.S.C. § 102(5). As the movant, the UST carries the overall burden of demonstrating, by at least a preponderance of the evidence, that one of these grounds is applicable.

■■■ For purposes of their application, the two grounds for dismissal under § 707(b)(3) are best understood as a codification of pre-BAPCPA case law, with there existing an abundance of reported cases wherein, prior to the passage of BAPCPA, courts dismissed Chapter 7 cases based upon both a debtor's "bad faith" and where the "totality of circumstances" revealed that the debtor was undeserving of Chapter 7 relief.[2] In this

---

1. This paragraph provides:

    After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter. In making a determination whether to dismiss

a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).

2. By way of example, prior to the enactment of BAPCPA, the Sixth Circuit held that, under § 707(b), "substantial abuse" could be "predicated upon either a lack of honesty or want

regard, it is a familiar rule of statutory construction that where words and phrases in a statute have a well-known common law meaning, it should be presumed that they are being used in the same sense in which they were understood at common law. *Thomas v. United States,* 189 F.2d 494, 501 (6th Cir.1951). It is also a rule of construction that an amendment to a statute is not to be construed as abolishing precedent set in prior case law unless such an alteration is clear from the words and context of the amendment. *Southern Utah Wilderness Alliance v. BLM,* 425 F.3d 735, 763 (10th Cir.2005) ("When Congress legislates against a backdrop of common law, without any indication of intention to depart from or change common law rules, the statutory terms must be read as embodying their common law meaning."), *citing Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). Finally, it is a closely related fundament of statutory construction that, where Congress codifies prior case law, those prior holdings remain not only good law, but should serve as a valuable touchstone for interpreting the statute. *CoStar Group, Inc. v. LoopNet, Inc.,* 373 F.3d 544, 553 (4th Cir.2004).

Insofar as it concerns pre-BAPCPA law in this Circuit, the seminal case having a close nexus to § 707(b)(3)'s first ground for determining the existence of abuse—"whether the debtor filed the petition in bad faith"—is the Sixth Circuit's decision in *Industrial Ins. Servs., Inc. v. Zick (In re Zick),* 931 F.2d 1124 (6th Cir.1991). In *In re Zick,* the Court, in addressing the propriety of dismissing a case "for cause" under § 707(a), held that a lack of good faith constituted a valid basis for dismissal. *Id.* at 1127. Although decided under subsection (a) of § 707, this decision's tenets have significant relevance in any "bad faith" analysis under § 707(b), with the Court in *In re Zick* recognizing strong commonalities on policy between these two subsections. For example, it was observed that both subsections (a) and (b) abhor the idea of providing the debtor with a head start as opposed to a fresh start; both provisions also require that a debtor attempt to deal equitably with his or her creditors. *Id.* at 1128, *citing In re Krohn,* 886 F.2d 123, 126 (6th Cir.1989).

In setting forth what constituted a lack of good faith, the Court in *In re Zick* opined that any such analysis must be undertaken on an *"ad hoc* basis." 931 F.2d at 1129. According to *In re Zick,* this is because the "facts required to mandate dismissal based upon a lack of good faith are as varied as the number of cases." *Id.* at 1127. In performing an *ad hoc* analysis, the Court stated that it found "particular merit in what is described as the smell test." *Id.* (internal citation and quotation omitted).

For this test, the Court in *In re Zick,* although not setting forth a list of its own,

---

of need as determined by the totality of the circumstances." *In re Krohn,* 886 F.2d 123, 126 (6th Cir.1989). With some minor variations in their approach, courts in other circuits likewise predicated the merits of any § 707(b) motion to dismiss on the totality of circumstances. *See, e.g., In re Price,* 353 F.3d 1135, (9th Cir.2004); *United States Trustee (In re Stewart),* 175 F.3d 796 (10th Cir.1999). Additionally, prior to BAPCPA's implementation, the Sixth Circuit in *Industrial Ins. Servs., Inc. v. Zick (In re Zick),* 931 F.2d 1124 (6th Cir.1991), held that a case could be dismissed based upon a debtor's lack of good faith in seeking bankruptcy relief. And again, like with the totality of the circumstances standard, other courts, including this Court, recognized a "bad faith" basis for dismissing a Chapter 7 case. *In re Ragan,* 171 B.R. 592 (Bankr.N.D.Ohio 1994) (equating a bad faith filing with a lack of honesty, thus justifying a dismissal pursuant to the Sixth Circuit's decision in In re Krohn). *See also In re Lenartz,* 263 B.R. 331 (Bankr.D.Idaho 2001); *In re McTague,* 198 B.R. 428 (Bankr.W.D.N.Y.1996).

found that those considerations relied upon by the bankruptcy court in dismissing the debtor's case in the first instance were appropriate. *Id.* at 1128. Among the considerations weighed, one strikes this Court as particularly relevant in this matter: the Debtors' failure to make significant lifestyle adjustments and efforts to repay. *Id.* For this consideration, a number of things stand out.

■ To start with, the Debtors, despite being supposedly unable to pay their unsecured creditors, still thought it appropriate to attempt to reaffirm on over one-half a million dollars in secured debt, with nearly all of the collateral constituting, at some level, luxury items. For this purpose, a luxury item may be defined as "[s]omething not essential but conducive to comfort or pleasure." *Websters II New Riverside University Dictionary*, 710 (1984). Given, therefore, its nonessential character, the retention of luxury items by a debtor seeking the protections of bankruptcy law has always been problematic. *In re Marcoux*, 301 B.R. 381, 384 (Bankr. D.Conn.2003). Although tolerated to a limited degree under the more forgiving "substantial abuse" standard of the former § 707(b), *supra*, Congress' decision to tighten the standard for dismissal makes the retention of any luxury items of significant value especially difficult to reconcile with the existence of good faith. This is especially true in this matter considering the scope of the collateral the Debtors sought to retain.

For example, there is no practicable reason why the Debtors needed to continue maintaining a "Pop–Up Camper" and an extra vehicle, the 2002 Ford Windstar. The Debtors' decision to reaffirm on the latter is especially disconcerting when it is considered that the collateral's value is at least $10,000.00 less than the value of the lien encumbering the property. More problematic is the Debtors' decision to reaf-

firm on their home and their two personal vehicles. While the Court cannot, in principle, denigrate the Debtors' decision to reaffirm on these categories of debts,— shelter and transportation expenses are allowed as a matter of course—the costs associated with these particular items of collateral fall well beyond what is reasonably necessary. A $430,000.00 house, requiring more than $4,000.00 a month to maintain, can only be categorized as a luxury item, with the same also being true of a 2005 Volvo and a 2004 Mercedes Benz.

The Debtors' actions also reveal a rather cavalier approach to their unsecured creditors. To see but a single facet of this, one need only consider the Debtors' purchase of their 2005 Volvo. Specifically, it is noted that the purchase of the vehicle occurred in the year just prior to the Debtors' bankruptcy filing, and thus it can be assumed that the Debtors were, at least to some extent, cognizant of their declining financial situation. A further questionable approach: the Debtors allocating almost $300.00 per month for phone service.

Bringing matters further into focus is that the record in this case is devoid of any evidence which would tend to show that the Debtors made any serious attempt to repay their debts. To the contrary, while incurring a significant amount of consumer credit-card obligations, the Debtors still continued to pay themselves through voluntary, monthly retirement contributions, totaling $645.86 per month or almost $8,000.00 per year. But as this Court explained in a prior § 707(b) matter:

> When looking to a debtor's "need" in a § 707(b) action, the Sixth Circuit Court of Appeals has set forth the precedent that, "a debtor's voluntary remuneration to a retirement account, whether by contribution or in the repayment of a loan, cannot be excluded from a debtor's 'disposable income.'" The reasoning for this

is straightforward: "it would be unfair to the creditors to allow the Debtors in the present case to commit part of their earnings to the payment of their own retirement fund while at the same time paying their creditors less than a 100% dividend."

*In re Glenn*, 345 B.R. 831, 835 (Bankr. N.D.Ohio 2006), *citing Harshbarger v. Pees (In re Harshbarger)*, 66 F.3d 775 (6th Cir.1995) and *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434–35 (6th Cir. 2004). This is no small matter.

If the Debtors had first sought relief under Chapter 13, instead of Chapter 7, they could have, in just utilizing their retirement contributions, proposed a plan of reorganization that would have made available almost $40,000.00 to pay their unsecured creditors—a very significant sum and one which would have made a meaningful dent in their unsecured debt, considering that of their $103,036.93 in unsecured debt, $47,000.00 of it constitutes long-term, nondischargeable student loan obligations. The lack of effort to even attempt a plan of reorganization is especially problematic in light of the Debtors' relatively young age, thereby affording them additional time to save for retirement. The Debtors' relatively high level of income also cannot be ignored. At the time the Debtors filed their bankruptcy petition, they earned $11,500.00 per month which amounts to an annual salary of $138,000.00, almost double the $71,426.00 median income for a family of five in Ohio.[3]

The figures set forth in their petition also raise questions as to the Debtors' candor. For example, with respect to their retirement accounts, the Debtors set forth that, although they were making combined monthly 401(k) contributions of $645.86, they had a total of only $3,300.00 in both their 401(k) accounts, under one-half year's worth of contributions. While possible, this ratio of contribution to principal is extremely high, constituting just five months worth of contributions, and cannot be explained through borrowing as no loans against the 401(k) accounts were disclosed in their petition. A couple of other matters further stain the Debtors' credibility.

First, the Debtors, in their petition, set forth that their current monthly expenditures, exclusive of servicing their unsecured debts, exceeded their current income by $2,557.67, thus begging the question: How did the Debtors manage to spend more money than they make? Additionally, the Debtors failed to initially disclose that they received rental income from leasing their mobile home.

Good faith is generally defined as "a state of mind consisting in honesty in belief or purpose or the absence of intent to defraud or seek unconscionable advantage." *In re Beitzel*, 333 B.R. 84, 93 (Bankr.M.D.N.C.2005), *citing* BLACK'S LAW DICTIONARY 713 (8th ed.2004). Bad faith has been defined in the opposite, entailing "a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." BLACK'S LAW DICTIONARY 139 (6th ed.1990); *see also Kaylor v. Rankin*, 356 F.Supp.2d 839, 853 (N.D.Ohio 2005) (bad faith has been defined as the opposite of good faith). When set within the confines of these definitions, all arrows point to this single conclusion: Under the smell test put forth by the Sixth Circuit in *In re Zick*, the cumulative weight of the foregoing considerations have an odoriferous quality tending strongly toward the existence of bad faith, hence, warranting a dismissal of

---

**3.** Census Bureau Median Family Income By Family Size available at www.usdoj.gov/ust/ eo/bapcpa/20060213/meanstesting.htm.

the Debtors' bankruptcy case for abuse pursuant to § 707(b)(3)(A).

■ Yet, insofar as it concerns the over-all application of § 707(b)(3), a finding that the Debtors filed their petition in bad faith under subparagraph (A) is not absolutely necessary to sustain a dismissal. This is because, as now explained, the same considerations above, plus a few additional ones, also support a dismissal under subparagraph (B) of § 707(b)(3).

In determining whether a case should be dismissed for "abuse," § 707(b)(3)(B) provides that a court must consider, in addition to whether the debtor filed the petition in bad faith, whether "the totality of the circumstances ... of the debtor's financial situation demonstrates abuse." Since its enactment with BAPCPA, no decision of precedential force has yet addressed this provision's "totality of circumstances" approach. Thus, like the issue of "bad faith" and the Sixth Circuit's decision in *In re Zick,* prior case law remains both useful and applicable.

Under applicable pre-BAPCPA law in this Circuit, it was explained that a "totality of circumstances" approach for abuse should be predicated upon both "a lack of honesty or want of need." *In re Krohn,* 886 F.2d 123, 126 (6 th Cir.1989). For this, the first ground, a lack of honesty, is predicated upon the absence of "good faith and candor in filing schedules and other documents," along with the events surrounding the bankruptcy filing such as whether the debtor engaged in eve of bankruptcy purchases or was forced into a Chapter 7 by unforeseen or catastrophic events. *Id.* The second ground, a want of need, focuses on whether the debtor has the ability to adequately pay his debts such as through funding a Chapter 13 plan of reorganization. *Id.*

As it applies to the first ground, it was previously explained in this matter that serious doubts exist as to the Debtors' complete candor in filing their schedules and other documents—*e.g.,* without explanation, the Debtors showed a significant monthly shortfall in their monthly budget. Additionally, not mentioned earlier, but also going contrary to the existence of honesty, is the absence of any evidence which would tend to indicate that the Debtors' bankruptcy filing was precipitated by an unforeseen or catastrophic event. Instead, it is just the opposite: the Debtors' worsening employment situation only became apparent after they filed their petition.

With respect to their "need" for Chapter 7 relief, many facets of the foregoing discussion on the existence of "bad faith" again have relevance. Central here, the Debtors will not be permitted, to the detriment of their unsecured creditors, to fund their retirement plans. Similarly, the Debtors do not "need" to spend $4,000.00 a month for housing; nor do the Debtors "need" to fund the cost of two luxury cars.

Additionally, but not earlier discussed, other monthly expenses listed by the Debtors strike this Court as excessive. To name just a couple: Spending $531.42 monthly for day care expenses when the Debtors have no preschool age children seems out of the ordinary. Likewise, allocating $1,200.00 dollars a month for food seems an extravagance ill-suited for a household that cannot pay its debts.

Notwithstanding, the focal point of the Debtors' position concentrated not on the above considerations, but rather on postpetition events, namely a major change in their financial circumstances due to Mr. Oot losing his job and Mrs. Oot's employment being placed in jeopardy. As evidence of this change, the Debtors submitted an updated accounting of their monthly income and expenses which showed a significant decline in both. (Doc. No. 60). Additionally, as evidence of their good faith, the Debtors pointed to the fact that

they have, contrary to their original intention, since surrendered all of their secured property.

▮▮▮ The starting point in any § 707(b) analysis centers on the conditions as they existed at the time the petition is filed. *In re Pier,* 310 B.R. 347, 354–55 (Bankr.N.D.Ohio 2004). This, however, does not mean, as the Debtors argue, that the Court cannot consider postpetition events beyond the date of the petition. *Id.* at 355. The purpose of § 707(b) is to limit the availability of Chapter 7 relief to only those debtors truly in need of such relief. *In re Wright,* 276 B.R. 399, 403 (Bankr. W.D.Pa.2002). And under § 105(a), this Court, as a court of equity, is conferred with the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" including "making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." *Id. See also In re Cortez,* 457 F.3d 448 (5th Cir.2006) (in § 707(b) action, bankruptcy court can and should consider postpetition events). Thus, as the Debtors espouse, postpetition events may, in appropriate circumstances, be relevant in a § 707(b) analysis when equity would be served thereby.

▮▮▮ But basic facets of equity require that a debtor come to the court with clean hands. Yet such is not the case here, with the Debtors, at the time they sought relief from the Court, intent on maintaining a lifestyle they could no longer afford. Even so, the Debtors' focus on postpetition events itself has a hollow ring. Specifically, it is observed that, even after losing his job, Mr. Oot did not seek to find a more inexpensive mode of transportation, instead only surrendering his 2005 Volvo after the Hearing on the Motion to Dismiss was heard by the Court.

Accordingly, for all the reasons stated herein, the Court finds that, whether under the "bad faith" standard of § 707(b)(3)(A) or the "totality of circumstances" test of § 707(b)(3)(B), this case should be dismissed for abuse. In this way, this observation made by the Second Circuit Court of Appeals fits perfectly: "This is a paradigm of the case that Section 707(b) was designed for: debtors enjoying a substantial income but seeking to transfer the cost of an unnecessarily extravagant lifestyle to creditors." *Kornfield v. Schwartz (In re Kornfield),* 164 F.3d 778, 781 (2nd Cir.1999).

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Accordingly, it is

***ORDERED*** that the Motion of the United States Trustee to Dismiss pursuant to 11 U.S.C. § 707(b)(1) and § 707(b)(3), be, and is hereby, GRANTED.

***IT IS FURTHER ORDERED*** that this case be, and is hereby, DISMISSED.