**In re Steven Richard JOHNSON and Michelle Lora Johnson, Debtors.**

**No. 08–02993–PB7.**

United States Bankruptcy Court, S.D. California.

Dec. 8, 2008.

Haeji Hong, Office of the U.S. Trustee, San Diego, CA, for U.S. Trustee.

Richard R. Schwabe, Vista, CA, for Debtors.

## ORDER ON MOTION TO DISMISS OF UNITED STATES TRUSTEE

PETER W. BOWIE, Chief Judge.

The United States Trustee has moved to dismiss this Chapter 7 case under 11 U.S.C. § 707(b)(3). The basis for the motion raises difficult issues of Congressional intent in its enactment in 2005 of the revisions to the Bankruptcy Code, known commonly as BAPCPA.

This Court has subject matter jurisdiction over the proceeding pursuant to 28 U.S.C. § 1334 and General Order No. 312–D of the United States District Court for the Southern District of California. This is

a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## BACKGROUND

Steven and Michelle Johnson (Debtors) filed their petition on April 14, 2008. The Debtors' scheduled property includes their residence in Escondido, California (Residence). The Debtors built the approximately 4,000 square foot Residence in May of 2003. Unfortunately for Debtors, shortly after the Residence was completed, Mr. Johnson, an airline pilot, had to accept a $60,000 cut in pay. The Debtors list the value of the Residence at $900,000, and the debt secured by it at nearly $1,100,000. The monthly mortgage expense for the Residence is $6,060, and total expenses associated with the property are scheduled at $8,286.

Debtors use a portion of the premises to operate Mrs. Johnson's non-profit dog rescue operation. Generally, Mrs. Johnson keeps and cares for six dogs on the property at a time. The operation is not revenue-generating.

The United States Trustee premises the motion to dismiss on the argument that Debtors' expenses to pay their mortgage and to maintain their Residence are unreasonably high. If they would give up the property they could purchase or rent at substantially lower expense, and in so doing they would free up income for the benefit of unsecured creditors. Therefore, the argument goes, allowing these Debtors to receive a discharge under Chapter 7 would constitute an abuse of Chapter 7.

## DISCUSSION

Section 707(b) of Title 11 was amended in 2005 after a lengthy struggle spanning years. The section now provides that a court may dismiss a Chapter 7 case filed by a debtor whose debts are primarily consumer debts if it finds that the granting of relief would be "an abuse" of Chapter 7. It is undisputed that Debtors' debts are primarily consumer debts.

Section 707(b) provides two alternative methods for determining whether "abuse" exists. Under § 707(b)(2) a presumption of abuse arises where an ability-to-pay threshold, calculated by subtracting allowable monthly expenses from monthly income, is exceeded under a means test formula (Means Test). For the purposes of this case, the pivotal provision of the Means Test, as discussed more fully below, is that a debtor's entire monthly mortgage payment, with no express limitation, is allowed as an expense. In the present case, the parties agree that Debtors do not exceed the ability-to-pay threshold and thus "pass" the Means Test. Hence, the presumption of § 707(b)(2) does not arise in this case. When the presumption does not arise (or is rebutted), § 707(b)(3) sets forth two alternate considerations for assessing abuse. Under § 707(b)(3) the Court is to consider whether the petition was filed in bad faith (§ 707(b)(3)(A)), or whether an abuse exists based on the "totality of the circumstances ... of the debtor's financial situation." (§ 707(b)(3)(B)). No allegations of bad faith have been presented. Accordingly, the Court must evaluate the Trustee's motion to dismiss based solely on the "totality of the circumstances ... of the debtor's financial situation." This brings us to the issue at hand.

The United States Trustee contends that the Debtors' monthly housing expense, made up primarily of the mortgage payment, is unreasonably high and urges the Court to consider this an abuse under the totality of circumstances of § 707(b)(3).[1] The Debtors, on the other hand, argue that since the mortgage pay-

---

1. In its § 707(b)(3) challenge, the United States Trustee lumped in all housing related

ment is an unlimited allowable expense under the Means Test of § 707(b)(2), the Court is precluded from considering it under the totality of the circumstances test. In so doing, the United States Trustee and the Debtors have taken the two sides of an issue which has been the subject of discussion since the passage of BAPCPA. In a nutshell, the issue is whether Congress, by allowing secured claims to be included without limitation in the Means Test of (b)(2), has limited the courts' discretion to consider them under the totality of circumstances test of (b)(3).

What makes the issue so difficult is trying to discern what interplay, if any, Congress contemplated as between subsection (b)(2)—the Means Test—and subsection (b)(3)—totality of the circumstances. A number of people anticipated during the years of debate over bankruptcy reform that Congress was going to set caps on allowable expenses for debtors as part of the structure of the Means Test. Indeed, Congress imported into the Means Test the "National Standards and Local Standards" issued by the Internal Revenue Service "for the area in which the debtor resides. . . ." 11 U.S.C. § 707(b)(2)(A)(ii)(I). Congress added some expenses as allowable, subject to a "reasonable and necessary" standard, and put caps on others, such as 5% on overages on food and clothing, and of $1,500 (now $1,650) per year per child for private or public education. In another subpart of § 707(b)(2), Congress allowed inclusion of overages for "home energy costs", again subject to a "reasonable and necessary" standard.

In sharp contrast to the foregoing, the very next subpart, § 707(b)(2)(A)(iii), provides:

expenses, including electricity, heating, water and sewer, phone, HOA, property taxes and insurance. However, expenses such as utilities are a Means Test line item subject to a

(iii) The debtor's average monthly payments on account of secured debts shall be calculated as the sum of—

(I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and

(II) any additional payments to secured creditors necessary for the debtor, in filing a plan under Chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts; . . . .

In other words, if a debtor has a long-term secured obligation (contractually due for 60 months or longer), those net amounts are added onto the Means Test calculation on top of the IRS Local Standards, such as for housing. Moreover, those amounts are not subject to any specified cap, whether as a percentage of the IRS Standards, a dollar amount, or even a "reasonable and necessary" standard.

If the foregoing is how the Means Test of § 707(b)(2) is intended to operate, a rhetorical question is why did Congress back off the otherwise formulaic approach of IRS standards and excess allowances subject to percentages or other caps. One explanation has been proffered by Professors Culhane and White in their article, "Catching Can–Pay Debtors: Is the Means Test the Only Way?", 13 Am. Bankr.Inst. L.Rev. 665, 676 (2005). There, they state:

A much bigger impact flows from the decision to let debtors deduct their total

cap under § 707(b)(2)(A)(ii)(V), and no § 707(b)(2) challenge has been brought. The Court will focus on the amount of the secured debt payment.

average monthly secured debt payments, with no express requirement that the collateral be necessary or the amount of the debt be reasonable. The omission of those limits appears intentional, for the very next sentence in the Code, which allows an additional deduction of cure payments, is expressly limited to cure payments necessary to retain possession of a few crucial assets like a principal residence and motor vehicle needed for the debtors and dependents. The unlimited secured debt deduction bought the support of home mortgage lenders and when Congress threw in limits on cramdown in Chapter 13, got the automobile industry on board as well. This deduction, however, virtually assures that an extremely small number of debtors will emerge as can-pays.

The authors observed:

After cutting that gaping hole in the means test, Congress authorized a long list of additional deductions.... Among these are deductions such as starting a health savings account or purchasing family health insurance at the time of filing, continuing to provide care for elderly or disabled household members even if the debtor has no legal obligation to do so, and private school expenses of $1500 per year per child. These deductions advance policies far different from maximum repayment of unsecured creditors.

Congress could have made the means test meaner than it is, and the pass rate lower. However, Congressional decisions to serve other important policies and carry support for enactment led to changes which substantially reduced the number of debtors the means test will exclude from chapter 7.

*Id.* at 676–77.

While it is a side issue to the present analysis, the authors go on to argue "that the means test is now the exclusive ability to pay test." *Id.* at 678. This Court disagrees with that blanket conclusion. For example, a Means Test analysis is required to recognize a secured obligation contractually due at the time of filing, even though a debtor has no intent to make the payment because the collateral will be surrendered. In that instance, the Means Test may be "passed", but still result in dismissal under § 707(b)(3) because examination of the totality of circumstances shows an ability to pay. See, e.g., *In re Maya*, 374 B.R. 750 (Bankr.S.D.Cal.2007); *In re Parada*, 391 B.R. 492 (Bankr. S.D.Fla.2008). Judge Wedoff, in his article "Judicial Discretion to Find Abuse Under Section 707(b)(3)", 71 Missouri L.Rev. 1035, 1047 (2006), describes the debtor who was unemployed for some portion of the six months preceding filing, thereby giving an inaccurate picture of projected disposable income. Judge Wedoff argues that § 707(b)(3) should be available to courts to prevent an abuse of Chapter 7 when a debtor clearly could make payments going forward. See, e.g., *In re Pak*, 378 B.R. 257 (9th Cir. BAP 2007), rev'd on other ground, *In re Kagenveama*, 541 F.3d 868 (9th Cir.2008). This Court agrees that § 707(b)(3) is available to a court faced with the factual circumstances of *Pak*, those set out by Judge Wedoff, in *Maya*, and likely other circumstances as well.

As noted earlier, during the Congressional struggles over the bill, it was anticipated by some that Congress would set bright line allowances for various expenses. And, as just discussed, in some areas they did, while in others they set no caps, such as in secured debt. Had Congress set caps across the board, the present debate probably would not exist. Now, however, courts are confronted with the argument that each court is charged,

through § 707(b)(3) with superimposing its own individual judgment on what is reasonable and necessary through the rubric of the totality of the circumstances test. Moreover, the argument urges that the responsibility extends even to areas Congress expressly addressed and declared would *not* give rise to a presumption of abuse under § 707(b)(2).

As noted above, this Court is persuaded there are circumstances that warrant dismissal under § 707(b)(3) although a debtor may have "passed" the Means Test. The challenge presented by this case is the contention that debtors should be denied resort to relief under Chapter 7 because their secured debt obligation for their principal residence is too high compared to IRS Standards. Assuming for the moment the validity of that argument asserted by the United States Trustee, debtors presumably would have three options: 1) convert this case to one under Chapter 13 or Chapter 11; 2) sell or walk away from their primary residence and find less expensive housing (and a lender who would lend for such a purchaser, since they have no equity in their home); or 3) suffer dismissal and have to fend for themselves against all their creditors.

Considering the first option, the Court acknowledges that one of the purported goals of the Means Test and EAPCPA was to move more debtors to Chapter 13 in the expectation of generating a return to unsecured creditors that would not be available in a Chapter 7. That said, in determining whether dismissal is warranted if a debtor does not consent to conversion to Chapter 13, or Chapter 11, it seems appropriate to examine whether a return might be generated in either of those Chapters that would not exist in a Chapter 7. In doing so, however, the Means Test of § 707(b)(2) is very much involved. Under 11 U.S.C. § 1325, governing confirmation of a Chapter 13 plan, subpart (b)(3) provides in relevant part: "Amounts reasonably necessary to be expended ... shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)...." If § 707(b)(2) contains no limit on secured debt for a principal residence, then by importation of § 707(b)(2) into § 1325 the same condition obtains. Moreover, the same occurs in a Chapter 11 for individual debtors pursuant to § 1129(a)(15)(B) (by importing § 1325(b)(2)). Because § 707(b)(2) applies in both Chapter 13 and Chapter 11, and because § 707(b)(2) has no cap on secured debt obligations for a primary residence there is no greater ability to pay in a Chapter 13 or 11 than in a Chapter 7.

The third option largely speaks for itself. Congress has closed the door to bankruptcy relief under 11 U.S.C. § 109 for certain classes of debtors. In Chapter 7, it provided for dismissal for an absence of good faith (not at issue in this case), as well as under § 707(b)(2), and the totality of circumstances under § 707(b)(3). In § 109 it has declared that debtors are ineligible for relief in Chapter 13 if they have too much secured or unsecured debt. But nowhere in Chapter 7 has Congress said that consumer debtors are ineligible for relief if they have too much secured debt for their principal residence. Section 707(b)(2) appears to declare to the contrary.

Which leaves us with the second option. With all the foregoing in mind, the United States Trustee's motion asks the Court to conclude that Congress intended the Court to force debtors to sell or walk away from their primary residences when the expenses of hanging onto the property are higher in some measure than the IRS Standards. Moreover, because there is no presumption of abuse under § 707(b)(2), it would be up to each individual court, in the

first instance, to decide when that measure has been reached.

This Court must be candid and acknowledge that the United States Trustee's argument has appeal on multiple levels. This Court was one of those that expected Congress to set some caps, including on home mortgage expenses, in part because there is an appearance issue of the efficacy of bankruptcy when individuals who are known in their community to have obtained relief continue to live in the same nice home or drive the same nice car simply because there is no equity in either for a trustee to realize for the benefit of creditors. (Of course, it is not at all clear how often that might really happen, and this Court suspects much more often the house or car has been lost to the lenders by foreclosure or repossession.)

On another level there is the spectre of the individual debtor trying to hang on to the proverbial "McMansion". In the minds of many, including this Court, there is a point at which allowing an individual debtor relief from unsecured debt while sinking most income into maintaining the debt service on such a property seems egregious.

On yet another level, judges generally prefer to be vested with discretion, rather than having to mechanically apply one formula or another.

■ If this Court were writing on a blank slate, or were a member of Congress working on the legislation, the foregoing issues would be firmly in mind. At the same time, the Court is aware that there may have been many other policy concerns that resulted in compromises or rearranged priorities. To the extent Congress' decision to not put some cap on secured debt under § 707(b)(2) was based on some policy concerns, as Culhane and White have stated, 13 Am. Bankr.Inst. L. Rev 665, 676 (2005), it would be wholly incon-sistent for Congress to address that policy concern in § 707(b)(2) with one hand, and yank it right back with the other under § 707(b)(3). Nor should a court arrogate the legislative authority to do what Congress did not, even when doing so would serve ends the court might view as salutary.

Another point that should not be overlooked is the continuing priority that secured debt enjoys throughout the Bankruptcy Code. Indeed, such protection was expanded as to certain vehicles in Chapter 13 under the so-called "hanging paragraph" which follows § 1325(a)(9). Further, it is well understood that a debtor in Chapter 13 cannot modify the rights of a creditor "secured only by a security interest in real property that is the debtor's principal residence". 11 U.S.C. § 1322(b)(2).

In a similar vein, it would seem quite ironic if Congress went through all it did to establish the assertedly more objective Means Test in place of individual discretion, only to turn around in § 707(b)(3) and hand the same discretion right back. Yet some courts seem to have taken just that position.

In grappling with these issues, multiple courts have looked to pre-BAPCPA case law for guidance in understanding the totality of the circumstances under § 707(b)(3). *In re Stewart,* 383 B.R. 429, 432 (Bankr.N.D.Ohio 2008). Indeed., this Court did so in *In re Maya,* 374 B.R. 750, 754 (Bankr.S.D.Cal.2007). That does not necessarily mean, however, that the facets or breadth of today's § 707(b)(3)'s totality of the circumstances is identical to the test that had evolved under the old § 707(b). That is the crux of the issue in this discussion. If Congress determines that there should be no cap on secured debt obligations on a debtor's primary residence for

purposes of the Means Test, and therefore no presumption of abuse arises under § 707(b)(2), can Congress properly be understood to intend that that same primary residence secured obligation can, by itself, be the basis for a finding of abuse under § 707(b)(3)?

Based on the record as before this Court, and the corresponding analysis set out above, the Court concludes that Congress did not intend that consumers would be denied access to Chapter 7 solely because of the amount of their mortgage payment on their principal residence.

Notwithstanding that conclusion, this Court has also examined pre-BAPCPA decisions concerning the totality of circumstances test as it was understood under the former § 707(b). In the Ninth Circuit the factors to be considered in evaluating the totality of the circumstances under former section 707(b) included:

(1) Whether the debtor has a likelihood of sufficient future income to fund a Chapter 11, 12, or 13 plan which would pay a substantial portion of the unsecured claims;

(2) Whether the debtor's petition was filed as a consequence of illness, disability, unemployment, or some other calamity;

(3) Whether the schedules suggest the debtor obtained cash advancements and consumer goods on credit exceeding his or her ability to repay them;

(4) Whether the debtor's proposed family budget is excessive or extravagant;

(5) Whether the debtor's statement of income and expenses is misrepresentative of the debtor's financial condition; and

(6) Whether the debtor has engaged in eve-of-bankruptcy purchases.

*In re Price,* 353 F.3d 1135, 1139–40 (9th Cir.2004).

One of the foremost factors to be considered under the totality of circumstances is "whether the debtor has a likelihood of sufficient future income to fund a Chapter 11, 12, or 13 plan which would pay a substantial portion of the unsecured claims...." *Price,* 353 F.3d at 1139. Standing alone, this might seem to indicate that a court should consider all of a debtor's income and expenses anew under the "totality of circumstances" test. However, as already discussed, the Means Test also finds its way into the confirmation analysis in both Chapters 13 and 11 as provided in §§ 1325, 1129. Under each section, in order to overcome an objection to confirmation, an individual must pay all claims in full or commit all of the debtor's "projected disposable income." In order to determine "projected disposable income," both sections 1325 and 1129 incorporate § 707(b)(2). That is, as noted above, under § 707(b)(2) a debtor is entitled to claim as an expense all actual monthly housing mortgage payments without the limitation of reasonableness. Thus it follows that when determining "whether the debtor has a likelihood of sufficient future income to fund a Chapter 11, 12, or 13 plan which would pay a substantial portion of the unsecured claims ...." the court may not consider in that analysis the reasonableness of payments on a mortgage.

The only other *Price* factor theoretically in play in the present case is whether the "proposed family budget is excessive or extravagant". Of course, the United States Trustee's focus is on the part of the budget that involves the primary residence expenses the bulk of which is the mortgage payment. So, in at least one sense, we are back to the core issue of whether that can be considered under the new § 707(b)(3) given the policy decisions Congress made in § 707(b)(2). Assuming that the size of the mortgage payment can be

considered notwithstanding § 707(b)(2), the Court is comfortable in concluding that the mortgage payment in this case is neither sufficiently excessive nor extravagant as to warrant dismissal on a totality of the circumstances basis under § 707(b)(3).

### *CONCLUSION*

For the foregoing reasons, the motion to dismiss brought by the United States Trustee under 11 U.S.C. § 707(b)(3) is denied.

IT IS SO ORDERED.