### In re Kirk Lee JENSEN and Linda Jean Jensen, Debtors.

### No. 2:08–bk–15225 ER.

United States Bankruptcy Court, C.D. California, Los Angeles Division.

April 28, 2009.

Mark J. Markus, Law Office of Mark J. Markus, Studio City, CA, for Debtors.

John P. Pringle, Roquemore, Pringle & Moore, Inc., Los Angeles, CA, for trustee.

## AMENDED MEMORANDUM OF DECISION

ERNEST M. ROBLES, Bankruptcy Judge.

Among the significant changes effected by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPC-PA")[1] was the introduction of the § 707(b)(2) Means Test.[2] Designed to fer-

---

1. Pub.L. No. 109–8, 119 Stat. 23 (2005).

2. Unless otherwise indicated, all statutory citations refer to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

ret out abusive bankruptcy petitions, the Means Test creates a "presumption of abuse" if the debtor's Current Monthly Income (CMI)—as determined by a detailed statutory formula—is above a certain amount. Debtors unable to rebut the presumption of abuse may have their cases dismissed or be required to fund a Chapter 13 plan. However, even debtors who survive the Means Test may see their cases dismissed pursuant to § 707(b)(3)(B), which permits the Court to dismiss a case if "the totality of the circumstances ... of the debtor's financial situation demonstrates abuse."

The present case requires the Court to determine the extent to which the § 707(b)(3)(B) totality of the circumstances test is constrained by the § 707(b)(2) Means Test. The United States Trustee ("UST") contends that in conducting the § 707(b)(3)(B) totality of the circumstances analysis, one of the factors the Court may consider is the amount of secured debt payments the debtors have chosen to make on property they plan to retain. Debtors Kirk Lee Jensen and Linda Jean Jensen ("Debtors") disagree, pointing out that the Means Test's presumption of abuse computation does not take into account the amount of a debtor's secured debt payments. If secured debt payments do not affect the Means Test determination, the Debtors argue, then neither can they affect the § 707(b)(3)(B) totality of the circumstances analysis. The UST's rejoinder is that as a separate provision, § 707(b)(3) is not in any way constrained by § 707(b)(2).

The Court declines to fully embrace the position of either the debtors or the UST. Instead, the Court concludes that although the § 707(b)(3)(B) totality of the circumstances analysis must be undertaken independently of the provisions of § 707(b)(2),

the § 707(b)(3)(B) analysis cannot reach a result inconsistent with the implicit policies of the § 707(b)(2) Means Test. Thus, absent additional indicia of abuse, a debtor's choice to continue to make secured-debt payments on retained property is not a basis for dismissing the debtor's Chapter 7 petition under § 707(b)(3)(B).

## I. Facts and Procedural Background

This matter is before the Court on the U.S. Trustee's Motion to Dismiss Chapter 7 Case Pursuant to 11 U.S.C. §§ 707(b)(1) and (b)(3)(B) ("Motion to Dismiss"). *See* Dkt. 12. The Court entered its initial Memorandum of Decision and Order on November 12, 2008. Dkt. 21–22. The Court subsequently granted the UST's Motion to Reconsider (Dkt. 24) and heard additional argument on the Motion to Dismiss on February 19, 2009. The Court has jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157, and General Order No. 266 of the U.S. District Court for the Central District of California.

Kirk Lee Jensen and Linda Jean Jensen ("Debtors") filed a voluntary Chapter 7 petition in April 2008, seeking a discharge of $87,234 in unsecured debt. Debtors' Schedule J reports average monthly income of $8,622.51 and average monthly expenses of $8,893, leaving a monthly deficit of $270.49. In their Chapter 7 Statement of Intention, Debtors stated that they would retain their motor home, boat, and single family home and continue to make regular payments. Debtors owe $63,256 on the motor home, $30,423 on the boat, and $800,754 on the single family home. Debtors make monthly payments of $396 on the motor home, $760 on the boat, and $4,446 on the single-family home. All three assets are now worth between 5% and 13% less than what the Debtors owe on them.[3]

Debtors purchased the motor home, boat, and single-family home in April of 2006, approximately two years before filing for bankruptcy. At that time, Debtors had sufficient income to afford these items. Debtor Kirk Jensen's income in 2006 was $114,000; in 2007, his income increased to $152,000. However, in 2008, as the economy deteriorated, Jensen's overtime hours were substantially reduced. The resulting loss of income precipitated the present bankruptcy petition.

The UST concedes that Debtors' petition does not trigger the "presumption of abuse" under the § 707(b)(2) Means Test. However, the UST argues that the Debtors' petition should nonetheless be dismissed pursuant to § 707(b)(3)(B) because the "totality of the circumstances ... of the debtors' financial situation demonstrates abuse." The UST notes that but for the Debtors' secured debt payments on the motor home and boat, the Debtors would have $450.51 in monthly income available to repay their unsecured creditors.[4] Over a 60–month period, this would enable the Debtors to repay $24,327 (or approximately 28%) of their unsecured debt.[5] Motion to Dismiss 12. The motor home and boat, the UST argues, are luxury items which the Debtors should not be permitted to retain to the detriment of their unsecured creditors. *Id.* at 9.

The Debtors argue that their decision to retain the motor home and boat cannot be the basis for dismissal under the § 707(b)(3)(B) totality of the circumstances test. Noting that the Means Test expressly permits the deduction of monthly secured debt payments from Current Monthly Income, § 707(b)(2)(A)(iii), the Debtors argue that relying upon those same monthly secured debt payments as a basis for dismissal under the totality of the circumstances test would contravene Congressional policy. Debtor's Opposition to UST's Motion to Dismiss ("Opposition") (Dkt. 13) at 4.

The Debtors concede that in conducting the totality of the circumstances test, the Court may assess aspects of their financial situation that are not provided for by the Means Test. But expenses which are already considered in the Means Test calculation, the Debtors maintain, are off-limits: "While § 707(b)(3) allows the court to examine the 'totality of the circumstances,' it does not allow the court to change congressionally mandated calculations." Opposition at 4.

## II. Discussion

### A. Interaction Between the § 707(b)(2) Means Test and the § 707(b)(3)(B) Totality of the Circumstances Test

Resolving this dispute over the meaning of "totality of the circumstances" requires

---

3. The motor home, on which Debtors owe $63,256, is now worth only $60,000 (5.15% less than what Debtors owe). The boat, on which Debtors owe $30,423, is worth $26,423 (13.17% less than what Debtors owe). The single-family home, on which Debtors owe $800,754, is worth $745,000 (6.96% less than what Debtors owe).

4. To arrive at this figure, the UST subtracted payments for the boat and motor home from Debtors' Schedule J average monthly expense. The UST also increased the Debtors' average monthly expense by a net $200. To

reach the net $200 per month increase, the UST added in $325 per month to cover the Debtors' anticipated additional daycare expenses, but subtracted the $125 per month deduction the Debtors claimed for an "emergency expenses" account. The UST maintains that the emergency expenses account is simply a savings account for non-specific expenses.

5. The UST computed the $24,327 figure based on payments of $450.51 per month over 60 months, less a 10% fee for a hypothetical Chapter 13 trustee.

an examination of the structure of § 707(b), which was substantially revised by BAPCPA. Prior to BAPCPA, § 707(b) stated simply that the Court "may dismiss a case ... if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter." The pre-BAPCPA code did not explain what conduct constituted "substantial abuse."

BAPCPA retained the language permitting the Court to dismiss cases for abuse, although it lowered the standard from "substantial abuse" to "abuse." The more significant change was Congress's decision to further define the conduct constituting "abuse" in §§ 707(b)(2) and (b)(3), a task that had previously been left entirely to the courts. Section 707(b)(2) sets forth the Means Test, which creates a rebuttable presumption of abuse if the debtor's current monthly income (CMI), reduced by statutorily permitted expenses, exceeds a certain threshold. Section 707(b)(3) sets forth additional considerations for the Court to evaluate in determining whether the case is abusive—specifically, "whether the debtor filed the petition in bad faith," or whether "the totality of the circumstances of ... of the debtor's financial situation demonstrates abuse."

Courts and commentators have struggled to define the interaction between §§ 707(b)(2) and (b)(3). See, e.g., *In re Johnson*, 399 B.R. 72, 75 (Bankr.S.D.Cal. 2008) ("What makes the issue so difficult is trying to discern what interplay, if any, Congress contemplated as between subsection (b)(2)—the Means Test—and subsection (b)(3)—totality of the circumstances."). At least one court has held, in support of the Debtor's position, that "while ability to pay is a factor in the totality of circumstances test, and may even be the primary factor to be considered, if it is the only indicia of abuse, the case should not be dismissed under that test." *In re Nockerts*, 357 B.R. 497 (Bankr.E.D.Wis.2006). This view is shared by commentators Culhane and White, who contend "that Congress intended the means test to be the only test of ability to pay under the revised Code":

> With the detailed statutory means test in place, "filed in bad faith" and "totality of the circumstances" no longer authorize judges to define ability to pay. Instead, these phrases must be read as limited to serious debtor misconduct.... The text and structure of the amended Code strongly suggest that the highly detailed means test is to replace, not just precede, other measures of ability to repay. Standard rules of interpretation direct courts to construe statutes so that all parts have meaning, and when both general and specific provisions cover the same subject matter, to let the specific provisions control. Use of judicial can-pay tests violates both of these rules, making the means test superfluous, and allowing general phrases to govern the specific. Section 707(b) as a whole makes sense when subsection two's means test governs ability to pay and subsection three covers debtor misconduct.

Marianne B. Culhane and Michaela M. White, *Catching Can–Pay Debtors: Is the Means Test the Only Way?*, 13 Am. Bankr. Inst. L.Rev. 665, 666–67 (2005).

But the majority of courts and commentators disagree with the *Nockerts* court and with Culhane and White, holding instead that the plain language of § 703(b)(3) permits consideration of the debtor's ability to pay: "By its terms, § 707(b)(3) 'explicitly mandates that the totality of the circumstances of the Debtor's financial situation be considered in determining whether there is an abuse when the presumption of abuse under paragraph (b)(2) does not arise or is rebut-

ted.' The broad language 'totality of the circumstances' and 'financial situation' clearly encompasses a debtor's ability to pay." *In re Lenton,* 358 B.R. 651, 663 (Bankr.E.D.Pa.2006) (citing *In re Paret,* 347 B.R. 12, 15 (Bankr.D.Del.2006)). *See also In re Zaporski,* 366 B.R. 758, 771 (Bankr.E.D.Mich.2007) ("[The] plain language [of § 707(b)(3)(B) ] is broad enough to encompass, indeed require, consideration of those facts that are probative of a debtor's ability to repay his or her creditors."); *In re O'Brien,* 373 B.R. 503, 506 ("This Court has observed, as have others, that § 707(b)(3) is best understood as a codification of pre-BAPCPA case law. Under pre-BAPCPA law, a debtor's ability to pay was a primary consideration in any § 707(b) analysis."); *In re McUne,* 358 B.R. 397, 398 (Bankr.D.Or.2006) ("A debtor's actual ability to pay a portion of his unsecured debts may be considered as part of the totality of the circumstances of the debtor's financial situation under § 707(b)(3)."); *In re Henebury,* 361 B.R. 595, 611 (Bankr.S.D.Fla.2007) ("In determining [under § 707(b)(3)(B) ] if the granting of relief would be an abuse of the provisions of Chapter 7, courts are required to determine if the debtor has the ability to pay a substantial portion of their unsecured claims through a Chapter 13 plan based upon the totality of the debtor's financial circumstances.").

*B. The § 707(b)(3)(B) Totality of the Circumstances Test Allows Courts to Fine–Tune the § 707(b)(2) Means Test Presumption*

■ The Court agrees with those authorities holding that the Means Test is only the first step in determining whether a debtor's petition is abusive. The Means Test functions as an initial screen to weed out those Chapter 7 petitions that are most clearly abusive. As one court explains, "Congress intended that there be an easily applied formula for determining when the Court should *presume* that a debtor is abusing the system by filing a chapter 7 petition." *In re Fowler,* 349 B.R. 414, 420–21 (Bankr.D.Del.2006). However, as with any bright-line rule, the Means Test presumption does not always provide the most accurate snapshot of the debtor's financial situation. That is to be expected; a formula complex enough to accurately predict every single debtor's ability to pay would be impossible to effectively administer. The Means Test sacrifices some level of accuracy in the interest of administrative efficiency.

■ Fortunately, the Bankruptcy Code anticipates that the Means Test alone cannot eliminate every single abusive filing and provides a backstop, the § 707(b)(3)(B) totality of the circumstances test. The totality of the circumstances test is best seen as providing a chance for the Court to refine the Means Test estimate. Since it permits individualized case-by-case examination, the totality of the circumstances test can weigh unusual circumstances that the Means Test does not—and could not reasonably be expected to—account for.

For example, the Means Test computes a debtor's Current Monthly Income (CMI) as the average of the debtor's income over the past six months. In the case of debtors who have recently changed jobs, CMI may bear little resemblance to actual monthly income. In fact, Debtors whose CMI diverges from their actual monthly income constitute a substantial portion of those debtors who survive the Means Test only to see their cases dismissed under the totality of the circumstances test. In *In re Pak,* the Means Test presumption of abuse did not arise because the debtor had been unemployed for most of the six months preceding his bankruptcy petition. 343

B.R. 239, 241 (Bankr.N.D.Cal.2006). Substituting the debtor's actual monthly income for his CMI, the Pak court concluded that the debtor had the ability to repay a substantial portion of his unsecured debt, and accordingly dismissed his case as abusive under the totality of the circumstances test. *Id.* at 246–47. *See also Henebury, supra*, at 613–14 (dismissing case because debtor's newly acquired job would provide substantial income to repay unsecured creditors).

Another way courts fine-tune the Means Test determination is by considering a debtor's actual expenditures, which often are not the same as the estimated expenditures used to determine the Means Test presumption. For example, the Means Test permits debtors to subtract from CMI payments on a residence they do not plan on retaining (on the theory that such payments provide an estimate of a debtor's eventual housing expenses). In *In re Haar*, debtors passed the Means Test, largely because of substantial mortgage payments on a residence they intended to surrender. In conducting the totality of the circumstances analysis, the court noted that debtor's monthly mortgage payments of $2,243 had been replaced by monthly rental payments of $888—leaving substantial income to pay unsecured creditors. The Haar court dismissed the case as an abuse of Chapter 7. *See also In re Edighoffer*, 375 B.R. 789, 794 (Bankr.N.D.Ohio 2007) (considering debtor's actual rent expense, which was only one-third of debtor's mortgage expense on property that was to be surrendered, in conducting the totality of the circumstances analysis).

C. *The § 707(b)(3)(B) Totality of the Circumstances Determination Must Respect Policies Implicit in the § 707(b)(2) Means Test*

 Although courts in the cases discussed above use the totality of the circumstances test to refine the Means Test determination, the adjustments the courts make are nonetheless consistent with the underlying policies of the Means Test. By contrast, in the present case, the UST asks the Court to use the totality of the circumstances test in a manner that directly contradicts the policies implicit in the Means Test. Specifically, the UST asks the Court to classify the Debtors' monthly secured debt payments as income available to repay unsecured creditors, even though the Means Test allows such payments to be deducted from CMI.

In the cases discussed above, the courts substituted debtor's actual payments on various obligations for the estimated payments used in the Means Test. In this case, the UST is not asking the court to replace the Means Test's payment estimate with a more precise estimate of the debtor's actual payments. Instead, the UST requests that the entire amount of income the Debtors allocate to secured debt payments debt be considered as income available to pay unsecured creditors. Rather than fine-tuning the Means Test presumption in accordance with the facts of an individual case, the UST asks the Court to completely disregard the policies implicit in the Means Test.

 "It is a cardinal principle of statutory construction that the statute ought, upon the whole to be so construed that, if it can be prevented, no clause, sentence or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). Congress has specified that for purposes of determining the presumption of abuse, a debtor's monthly payments on account of secured debt shall not be considered. § 707(b)(2)(A)(iii). Considering such payments under the § 707(b)(3)(B) totality of the circumstances test would render the

language in § 707(b)(2) disallowing consideration of those payments superfluous. As the court in *In re Johnson, supra,* aptly stated: "To the extent Congress' decision to not put some cap on secured debt under § 707(b)(2) was based on some policy concerns, . . . it would be wholly inconsistent for Congress to address that policy concern in § 707(b)(2) with one hand, and yank it right back with the other under § 707(b)(3)." *Johnson,* 399 B.R. at 78.

D. *Dismissal Under the § 707(b)(3)(B) Totality of the Circumstances Test is Justified if Additional Indicia of Abuse are Present*

■ This is not to say that the Court may never classify a debtor's secured debt payments as income available to pay unsecured creditors. Such a classification may be appropriate where other indicia of abuse are present. While it is impossible to provide an exhaustive list of the myriad ways in which debtors could abuse Chapter 7, common forms of abuse include purchases made on the eve of bankruptcy and purchases that cause the debtor to become insolvent. For example, one court invoked the totality of the circumstances test to dismiss the debtor's Chapter 7 petition based on the debtor's intent to reaffirm secured-debt payments on an SUV purchased only twelve days prior to filing. *In re Worrel,* 2007 WL 3374593, at *4 (Bankr. N.D.Iowa 2007).

■ Defining eve-of-bankruptcy purchases by reference to a precise timetable (e.g., a purchase made X days prior to filing is presumptively abusive) would be counterproductive, as enterprising debtors would simply consult the timetable and make their purchases one day before. Furthermore, determining whether an eve-of-bankruptcy purchase is abusive under the totality of the circumstances test is a case-by-case inquiry that, as the test sug-

gests, must be made only after considering all the relevant circumstances peculiar to each debtor's individual case.

■ However, several generally applicable considerations are worth noting. First, to avoid triggering a determination of abuse, more expensive purchases must be made further in advance of filing for bankruptcy than less expensive purchases. For example, the presumption of abuse is more likely to be triggered by a debtor who purchases a new $50,000 luxury car 120 days before filing than it is by a debtor who purchases a $5, 000 used car 30 days before filing.

Whether a purchase is expensive must be evaluated in light of the financial situation of each individual debtor. This can be done by calculating the percentage of the debtor's monthly income necessary to fund the purchase. To illustrate, the purchase of a $20,000 car would be considered expensive as to a debtor who was required to devote 40% of monthly income to the payments; whereas the same purchase would not be considered expensive as to a debtor required to devote only 5% of monthly income to the payments. *See also Worrel, supra,* at *4 (filing was abusive where debtors purchased two cars requiring total payments equal to 38% of their monthly income; debtors purchased one car twelve days before filing and the other ninety days before filing).

■ Second, purchases that cause the debtor to become insolvent generally give rise to a determination of abuse, regardless of the length of time that elapses between the purchase and the bankruptcy filing. The Bankruptcy Code is intended to afford relief to the "honest but unfortunate debtor," not to the debtor who makes purchases that she knows she cannot afford. *Brown v. Felsen,* 442 U.S. 127, 128, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979) (citing

*Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)).

*E. The Debtors' Petition Was Not Abusive Within the Meaning of the § 707(b)(3)(B) Totality of the Circumstances Test*

 This case does not present indicia of abuse sufficient to justify classifying the Debtors' secured-debt payments as income available to pay unsecured creditors, a classification that would require the Court to find that the Debtors' Chapter 7 petition is abusive. The Debtors did not incur the secured debt obligations at issue shortly before bankruptcy. Instead, the Debtors purchased the boat and the motor home two years prior to filing. Furthermore, the purchase of the boat and the motor home did not precipitate the Debtors' insolvency. At the time Debtors made the purchases in 2006, they had monthly income of $9,500. The total monthly debt service on the purchases was $1,156, or approximately 12% of the Debtors' monthly income. In 2007, Debtors' monthly income increased to $12,649; as a result, Debtors were required to devote only 9% of their monthly income to payments on the boat and motor home. Debtors were forced to file for bankruptcy not because they spent more on luxury goods than they could afford, but rather because the declining economy adversely impacted Debtor Kirk Jensen's salary.

*F. Refusing to Permit Debtors to Retain Secured-debt Property Would Contravene the Favorable Treatment for Secured Creditors that Congress Expressly Provided for in § 707(b)(2)*

Courts that have dismissed cases as abusive based on the debtor's high secured debt payments have emphasized the unfairness to unsecured creditors. These courts understandably bristle at the pros-pect of permitting debtors to continue enjoying luxury goods at the expense of their unsecured creditors. One court confronting the issue aptly observed that "there is no practicable reason why the Debtors need to continue maintaining a 'Pop–Up Camper' and an extra vehicle, the 2002 Ford Windstar." *In re Oot*, 368 B.R. 662, 667 (Bankr.N.D.Ohio 2007).

This Court certainly shares the discomfort other courts have felt at the prospect of permitting debtors to retain luxury goods in defiance of their unsecured creditors. However, the Bankruptcy Code seeks to further policies other than making unsecured creditors whole, especially in situations where unsecured creditors can be made whole only at the expense of secured creditors. Chief among these policies is advancing the availability of secured credit. *See, e.g., In re Proalert, LLC*, 314 B.R. 436, 441 (9th Cir.BAP2004) ("Embodied in the Bankruptcy Code is a policy decision to protect secured credit practices.").

Were the Court to adopt the UST's position, many debtors would be forced to default on their secured credit obligations as a precondition of obtaining Chapter 7 relief. The secured creditors could look to the collateral to make them whole, but in most cases would not be able to recover the entire obligation because the collateral would be worth less than the debt. Further, the costs of repossessing and reselling the collateral would further reduce the secured creditor's recovery.

The case of *In re Oot* illustrates the problem from the perspective of secured creditors. In that case, the Court found "especially disconcerting" the debtors' decision to retain a vehicle whose value was at least $10,000 less than what was owed on it. *Oot, supra*, at 667. Viewing the situation exclusively from the perspective of unsecured creditors, the debtors' deci-

sion is indeed troubling—money that could go to unsecured creditors is instead devoted to making payments on a vehicle encumbered by far more debt than it is worth.

What the *Oot* court failed to account for is that the debtor's decision to retain secured-debt property is a zero-sum game, in which either secured creditors or unsecured creditors will emerge the winners. Had the Court permitted the debtors to retain the vehicle, their secured creditors would be spared the losses associated of disposing of the collateral, but their unsecured creditors would get nothing. Since the court did not allow the debtors to reaffirm the debt and retain the vehicle, their unsecured creditors received some recovery, but their secured creditors sustained losses of $10,000 plus the costs of liquidating the collateral.

Therefore, refusing to permit debtors to retain secured-debt property does more than punish the debtors—it also reallocates the balance of risk between secured and unsecured creditors. As one commentator has observed, in the zero-sum battle between secured and unsecured creditors, "the secured creditor's advantage is the unsecured creditor's disadvantage." Homer Kripke, *Law and Economics: Measuring the Economic Efficiency of Commercial Law in a Vacuum of Fact*, 133 U. Pa. L.Rev. 929, 949 (1985). As demonstrated by the Means Test's provisions permitting the deduction of secured-debt obligations from CMI, Congress has conferred an advantage on secured creditors by giving debtors the option of retaining secured-debt property. Although Congress's choice to confer various advantages upon secured creditors is controversial,[6] it is a legislative choice that the Court will not disturb. Of course, the unintended but unavoidable consequence of this Congressional decision to favor secured credit is that some debtors will be able to retain luxury goods if they are willing to continue making the secured debt payments, even if that means their unsecured creditors will not always be made whole.

The Court also notes that an interpretation of § 707(b)(3) which permits debtors to continue making secured debt payments is consistent with other provisions of the Bankruptcy Code that extend favorable treatment to secured creditors. For example, § 363(e) entitles holders of secured claims to "adequate protection" of those claims under certain circumstances. As explained by the Supreme Court, § 363(e) requires the bankruptcy court to "place such limits or conditions on the trustee's power to sell, use, or lease [the secured creditor's] property as are necessary to protect the creditor." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Similarly, secured creditors are entitled to relief from the automatic if they can satisfy the requirements of § 362(d).

Finally, substantial policy considerations support the Court's holding. As one scholar has pointed out, an "essential aspect of granting security, from the viewpoint of both the secured creditor's interests and society's interest in plentiful credit and rapid credit decisions, is the favored treatment of secured creditors in the law of

---

**6.** *See, e.g., Lynn M. Lopucki, The Unsecured Creditor's Bargain*, 80 Va. L.Rev. 1887, 1946–47 (1994) (lamenting the "unsecured creditors' loss of power when the case moves to bankruptcy" and describing bankruptcy as "the unsecured creditor's ... nemesis"); Robert E. Scott, *A Relational Theory of Secured Financing*, 86 Colum. L.Rev. 901, 902 (1986) (noting that the "benefits to secured creditors from taking security are offset by the increased costs to unsecured creditors who face a corresponding reduction in the pool of assets available to them upon default.").

bankruptcy." *Kripke, supra,* at 948. Refusing to permit debtors to continue making secured debt payments would take away one aspect of the favorable treatment secured creditors receive in bankruptcy and would correspondingly reduce the availability of secured credit. *Cf. Nobelman v. American Savings Bank,* 508 U.S. 324, 332, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) (Stevens, J., concurring) (explaining that the Bankruptcy Code's "favorable treatment of residential mortgagees was intended to encourage the flow of capital into the home lending market").

G. *The Debtor's Failure to Execute a Reaffirmation Agreement Does Not Render Their Chapter 7 Petition Abusive*

The UST argues that the Debtors' failure to execute a reaffirmation agreement renders their Chapter 7 petition abusive. Instead of electing to redeem the property pursuant to § 722 or reaffirm the debt pursuant to § 524(c), the Debtors indicated on their Statement of Intention that they would "retain [the] collateral and continue to make regular payments." According to the UST, the "Debtors here can still elect to surrender the subject motor home and boat after entry of their bankruptcy discharge with no consequences, including no liability for the un-affirmed contractual balance. This not-unlikely scenario would allow Debtors to retain all of the excess income which the [UST maintains] should be available to repay all of their unsecured creditors ... pro-rata." Motion to Reconsider 17. The UST concedes that the Debtors' secured creditors "have not objected to [the Debtors'] failure to reaffirm." *Id.*

The option of retaining and continuing to make payments on secured property without reaffirming the debt or redeeming the property has been labeled "ride-through" or "retain and pay." Prior to the enactment of BAPCPA, courts in the Ninth Circuit held that Debtors had a right to elect ride-through even over a secured creditor's objections. *In re Parker,* 139 F.3d 668, 672 (9th Cir.1998). That is, if debtors remained current on the property, the automatic stay remained in effect and lenders could not foreclose based solely on the debtors' breach of a bankruptcy default clause.

BAPCPA eliminated the debtor's right to elect ride-through in cases where secured creditors object. Section 521(a)(6) requires the debtor to reaffirm secured debt or redeem property within 45 days of the first § 341(a) meeting of creditors. If the debtor fails to reaffirm or redeem within the required time period, the automatic stay "is terminated with respect to the personal property of the estate or of the debtor which is affected, such property shall no longer be property of the estate, and the creditor may take whatever action as to such property as is permitted by applicable non-bankruptcy law." § 521(a)(6)(B). Further, the secured lender may be able to foreclose upon the property even if the debtor's payments are current. Section 521(d)—also added by BAPCPA—provides that bankruptcy default clauses are enforceable against debtors who fail to timely reaffirm or redeem.[7]

However, nothing in BAPCPA prevents debtors and secured creditors from engaging in what scholars have vari-

---

**7.** Section 521(d) provides in relevant part: "If the debtor fails timely to take the action specified in subsection (a)(6) of this section, .... Nothing in this title shall prevent or limit the operation of a provision in the underlying lease or agreement that has the effect of placing the debtor in default under such lease or agreement by reason of the occurrence, pendency, or existence of a proceeding under this title or the insolvency of the debtor."

ously described as "voluntary ride-through," "creditor acquiescence," or "informal reaffirmations." *See* William C. Whitford, *A History of the Automobile Lender Provisions of BAPCPA,* 2007 U. Ill. L.Rev. 143, 154 (using the terms "voluntary ride-through" and "creditor acquiescence"); Karen Gross, *Perceptions and Misperceptions of Reaffirmation Agreements,* 102 Com. L.J. 339, 347–48 (1997) (using the term "informal reaffirmations"). In a voluntary ride-through, the secured creditor declines to exercise its legal remedies, allowing the debtor to retain the property provided the debtor continues making payments.

Prior to the enactment of BAPCPA, the voluntary ride-through was used in the five circuits which held that the debtor had no right to ride-through if the creditor objected.[8] For example, a study by Culhane and White examined the disposition of motor vehicles in bankruptcies in Georgia and Wisconsin, jurisdictions in which pre-BAPCPA decisions held that debtors did not have a right to elect ride-through over their creditors' objections. *See generally* Marianne B. Culhane & Michaela M. White, *Debt After Discharge: An Empirical Study of Reaffirmation,* 73 Am. Bankr. L.J. 709 (1999) ("Study of Reaffirmation"). The study found that in Georgia, 39% of the vehicles were neither surrendered, redeemed, or reaffirmed (the figure was 46% in Wisconsin). *Id.* at 740. The authors attempted to trace the post-bankruptcy fate of these vehicles by consulting Department of Motor Vehicles records. Of those vehicles the authors were able to trace, a significant number were still registered to debtors who had not redeemed or

reaffirmed. Presumably, the secured creditors permitted these debtors to retain the vehicles and continue paying for them, even though the creditors had the right to insist that the vehicles be surrendered, redeemed, or reaffirmed. *Id.* One commentator has predicted that voluntary ride-throughs may actually increase post-BAPCPA as a result of the increased costs of complying with the new disclosure requirements for an enforceable reaffirmation agreement. *See* Jean Braucher, *Rash and Ride–Through Redux: The Terms for Holding on to Cars, Homes and Other Collateral Under the 2005 Act,* 13 Am. Bankr.L.J. 457, 463.

Were the Court to adopt the UST's position and find that the case is abusive based on the lack of a reaffirmation agreement, debtors wishing to retain secured-debt property would be required to reaffirm as a precondition of Chapter 7 relief. The reaffirmation requirement would apply even in cases, such as this one, where the secured creditors are willing to permit a voluntary ride-through. While BAPCPA's additional provisions enable secured creditors to prevent a ride-through, nothing in BAPCPA prevents secured creditors from acquiescing to a ride-through if they determine that doing so is in their best interests.

For a variety of reasons, creditors may conclude that forcing debtors to reaffirm is not in their interest. For example, secured creditors may determine that the additional protection they receive through a reaffirmation agreement is outweighed by the transaction costs associated with

---

**8.** The First, Fifth, Sixth, Seventh, and Eleventh Circuit held that the pre-BAPCPA Bankruptcy Code did not afford debtors a right to the ride-through option. *See Bank of Boston v. Burr (In re Burr),* 160 F.3d 843, 847–48 (1st Cir.1998); *Johnson v. Sun Fin. Co. (In re Johnson),* 89 F.3d 249, 252 (5th Cir.1996); *Gen. Motors Acceptance Corp. v. Bell (In re Bell),* 700 F.2d 1053, 1058 (6th Cir.1983); *Taylor v. AGE Fed. Credit Union (In re Taylor),* 3 F.3d 1512, 1516 (11th Cir.1993).

executing the agreement.[9] This may be particularly true where debtors demand concessions in exchange for executing a reaffirmation agreement.[10] Further, some debtors may refuse to execute a reaffirmation agreement, gambling that creditors would rather acquiesce to a voluntary ride-through than foreclose on collateral worth less than the underlying debt.[11]

For whatever reason, it is clear that in some instances—including in this case—secured creditors decide that their interests are better served by acquiescing to a voluntary ride-through than taking advantage of BAPCPA's additional protections. Indeed, as indicated by Culhane and White's Study of Reaffirmation, prior to BAPCPA, a significant portion of secured creditors in jurisdictions refusing to recognize the debtor's right to ride-through nonetheless acquiesced to voluntary ride-throughs. Requiring debtors who wish to retain secured-debt property to execute a reaffirmation agreement, even in situations where secured creditors have decided a reaffirmation agreement is not in their interest, would be a perverse interpretation of the BAPCPA provisions intended to provide additional protections to secured creditors.

The Court is mindful of the UST's broader point—namely, that the Debtors' failure to execute a reaffirmation agreement increases the probability that they will surrender the motor home and boat post-discharge, given that they will no longer be personally liable for the debt. However, the mere possibility that the Debtors may not follow through on their stated intention of retaining the motor home and boat and continuing to make regular payments cannot form the basis for a finding that the Debtors' Chapter 7 petition is abusive. The Court must decide the Motion to Dismiss based on the evidence presently before it, rather than the possibility that the Debtor may or may not take certain action in the future.

**Conclusion**

For the reasons stated above, the UST's Motion to Dismiss Debtors' case for abuse under the § 707(b)(3)(B) totality of the circumstances test is denied.

---

**9.** *See Braucher, supra,* at 463 ("[I]t should be noted that the increases costs of compliance with the new disclosure requirements for an enforceable reaffirmation agreement are likely to increase the willingness of creditors to acquiesce in ride-through.").

**10.** *See Culhane & White, Study of Reaffirmation, supra,* at 741 ("Lenders might allow ride-through because the transaction costs and possible renegotiation of terms in the reaffirmation process may cost them more than the debtor's personal liability is worth.").

**11.** *See Braucher, supra* note 9, at 475 ("In non-ride-through circuits under the pre–2005 Bankruptcy Code, chapter 7 debtors frequent-

ly put creditors to the painful choice of either accepting full payment on the debt, with contract interest, or foreclosing on collateral. It is particularly difficult to choose foreclosure when the collateral is worth less than the debt. Therefore, when the debtor continued to pay the full debt without reaffirming, often the creditor would take the money and not foreclose, despite the fact that discharge makes the debtor no longer personally liable. This is ride-through by creditor acquiescence. Because the creditor would only recover wholesale value less repossession and sale costs if it exercised its in rem rights against personal property such as a vehicle, often the creditor would accept the full payment with contract interest.").